# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| SARN ENERGY LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No.: N17C-06-355 EMD CCLD |
| | ) |
| TATRA DEFENCE VEHICLE AS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Submitted:  July 19, 2018
Decided: November 5, 2018

*Upon SARN Energy LLC's Motion to Dismiss Defendant's Amended Counterclaim*
***GRANTED in part and DENIED in part***

Oderah C. Nwaeze, Esquire, Duane Morris LLP, Wilmington, Delaware, Ryan E. Borneman, Esquire, Duane Morris LLP, Philadelphia, Pennsylvania.  *Attorneys for Plaintiff SARN Energy LLC.*

Philip Trainer, Jr., Esquire, Hayley Lenahan, Esquire, Ashby & Geddes, Wilmington, Delaware, Kenneth J. Pfaehler, Esquire, Dentons US LLP, Washington, D.C.  *Attorneys for Defendant Tatra Defence Vehicle, a.s.*

**DAVIS, J.**

## I. INTRODUCTION

This breach of contract action is assigned to the Complex Commercial Litigation Division of the Court.  Tatra Defence Vehicle a.s. ("Tatra") manufactures armored fighting vehicles called the Pandur.  Tatra hired SARN Energy LLC ("SARN") to help facilitate sales of the Pandur to the Slovak Republic or Czech Republic.  The parties memorialized the deal in the Defense Policy Analysis and Advisor Agreement (the "Agreement") on January 14, 2016.[1]  Tatra sold 20 Pandurs to the Czech Ministry of Defense (the "Ministry").  Tatra made an initial

---

[1] Counterclaims, Ex. 2.  The Defense Policy Analysis and Advisor Agreement will be cited as "Agreement § __."

payment under the Agreement.  SARN demanded full payment under the Agreement.  Tatra refused payment.  SARN filed suit for breach of contract.  Tatra answer and counterclaimed.

SARN filed the Motion to Dismiss Defendant's Amended Counterclaim (the "Motion"). Tatra filed the Opposition of Defendant and Counterclaim Plaintiff Tatra Defence Vehicle, A.S. to SARN Energy LLC's Motion to Dismiss the Amended Counterclaim (the "Opposition"). SARN filed its Reply Brief Supporting its Motion to Dismiss Defendant's Amended Counterclaims (the "Reply").   The Court held a hearing (the "Hearing") on the Motion, the Opposition and the Reply on July 19, 2018.  At the conclusion of the Hearing, the Court took the Motion under advisement.

For the reasons set forth below, the Court **GRANTS in part and DENIES in part** the Motion.

## II. RELEVANT FACTS[2]

Representatives from Tatra and SARN met in Washington, D.C. between January 10 and 13, 2015.[3]  There was an additional meeting on January 14, 2016 at the Army and Navy Club in Washington, D.C.[4]  Stephen Richards, Armen Agas, and Barton Marcois attended the Army and Navy Club meeting.[5]   At that meeting, Mr. Richards stated that he was the chairman of SARN.[6] Mr. Agas indicated that he was deputy to the chairman of SARN.[7]  Mr. Marcois held himself out at the director of SARN.[8]

---

[2] For purposes of the Motion, the Court is utilizing the facts as set forth in SARN's complaint and Tatra's answer and counterclaims.  So the facts set forth in this opinion (including adjectives and adverbs) are as plead by the parties.  For purposes of the Motion, the Court must view the alleged facts in a light most favorable to Tatra. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[3] Countercl. ¶ 4.
[4] *Id.* ¶ 4.
[5] *Id.* ¶ 4.
[6] *Id.* ¶ 4.
[7] *Id.* ¶ 4.
[8] *Id.* ¶ 4.

Jaroslav Strnad and Michal Strnad were also present at the Army and Navy Club meeting.[9] Jaroslav Strnad was a member of the Supervisory Board of Tatra's parent company, Czechoslovak Group ("CSG").[10] Michal Strnad was the president of CSG.[11] Mr. Richards, Mr. Agas, and Mr. Marcois represented to the Strnads that they "had connections and contacts with the U.S. Department of Defense, others in the American government and with the governments of the Czech Republic and Slovak Republic, and that they could use those connections and contacts to assist Tatra in achieving a sale of Pandur fighting vehicles to the Czech and Slovak Republics."[12] The representatives from Tatra and SARN shook hands and agreed that SARN would assist Tatra in selling Pandurs.[13]

On January 14, 2016 SARN and Tatra entered into the Agreement.[14] Although Tatra and SARN finalized and signed the Agreement on January 29, 2016, the parties dated the Agreement for the same date—January 14, 2016—as the oral agreement at the Army and Navy Club.[15] Tatra retained SARN to provide analysis and advisory services to Tatra concerning geopolitical policy matters in efforts to enter into a contract with Slovak Republic or the Czech Republic to sell Pandur armored vehicles.[16] Specifically, the Agreement states "[SARN] will exert best efforts to advise [Tatra] on geopolitical policy matters in the sale of Pandur vehicles to the Slovak Republic and Czech Republic."[17] Tatra agreed to pay $1 million to SARN to facilitate the sale of 20 Pandurs.[18]

---

[9] *Id.* ¶ 4.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* ¶ 5.
[14] Compl. ¶ 4.
[15] Countercl. ¶ 7.
[16] Compl. ¶ 5.
[17] Agreement § 2.
[18] Compl. ¶ 6.

On January 30, 2017, Tatra entered into an agreement with the Czech Ministry of Defense to sell 20 Pandur vehicles for approximately $80 million.[19] Tatra received its initial payment from the Ministry of Defense in June 2017.[20]

On March 14, 2017, Tatra paid SARN $40,000 as partial payment for services performed under the Agreement.[21] On April 7, 2017, SARN sent a letter demanding the remaining $960,000.[22] Tatra did not respond to the April 7 Letter.[23] On May 4, 2017, SARN's counsel again demanded payment from Tatra.[24] On May 11, 2017, Tatra responded that it had not yet received the initial payment from the Ministry.[25] On May 17, 2017, Tatra informed SARN that the Ministry would pay Tatra within one month.[26]

On June 4, 2017, SARN sent a final demand for payment.[27] On June 16, 2017, Tatra requested documentation for tax purposes and stated that "Tatra does not dispute its payment obligations" arising from the Agreement.[28] On June 21, 2017, SARN again requested payment under the Agreement.[29] Tatra did not make any further payments under the Agreement.

On July 19, 2017, Mr. Borneman sent a letter to CSG, Tatra's parent company, "falsely alleging that the Strnads were associating with agents of nations hostile to NATO and that they and CSG had financial associations with hostile nation agents."[30] Mr. Borneman also sent this letter to the Czech National Security Office.[31]

---

[19] *Id.* ¶ 8.
[20] *Id.* ¶ 9.
[21] *Id.* ¶ 11.
[22] *Id.* ¶ 12.
[23] *Id.* ¶ 13.
[24] *Id.* ¶ 14.
[25] *Id.* ¶ 15.
[26] *Id.* ¶ 16.
[27] *Id.* ¶ 18.
[28] *Id.* ¶ 19; *see also* Countercl., Ex. 5 (dated June 15, 2017 Prague time).
[29] Compl. ¶ 23.
[30] *Id.* ¶ 31.
[31] *Id.*

On August 9, 2017, Mr. Borneman sent another letter (the "August 9 Letter") to CSG and the Czech National Security Office.[32] The August 9 Letter stated that CSG "may be subject to a sanction investigation because of ongoing reports about CSG's activities with agents and companies affiliated with the Russian Federation, including media reports of CSG cooperating on railways projects with Russian entities."[33] "On November 1, 2017, Mr. Borneman admitted that in fact he has no knowledge of any sanctions investigations of CSG or its affiliates and subsidiaries."[34] This letter was written on a SARN SD3 LLC ("SD3") letter head.[35]

On November 3, 2017, Mr. Richards sent a letter to CSG claiming that "CSG affiliate Retia a.s. is reported as transacting with Russian intelligence services in order to offer solutions to the Russian government."[36] This letter was also written on an SD3 letter head.[37]

Tatra alleges that SARN and SD3 are alter-ego companies.[38] Tatra contends that SARN and SD3 share the same directors and phone number.[39] Tatra also alleges that SARN and SD3 are "dominated" by Mr. Richards and operated out of his house.[40] Finally, Tatra asserts that neither SARN nor SD3 have any employees.[41]

Tatra contends that Mr. Richards and Mr. Marcois solicited and provided information for articles containing false and defamatory statements about CSG published in: "Real Clear Defense on July 17, 2017, titled 'The Czech- Russian Arms Trade Connection;' The Daily Caller on November 10, 2017, titled 'Putin's War Dogs in Europe;' and Foreign Policy on March 16,

---

[32] *Id.* ¶ 33.
[33] *Id.*
[34] *Id.* ¶ 36.
[35] *Id.* ¶ 43.
[36] *Id.* ¶ 39.
[37] *Id.* ¶ 43.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*

2018, titled 'Putin is Poisoning Prague.'"[42] Tatra alleges that these articles defamed CSG and CSG's family of companies including Tatra.

On June 28, 2017, SARN filed the Complaint for breach of contract. SARN seeks $960,000–the remaining balance under the Agreement. On March 23, 2018, Tatra filed its Answer and Amended Counterclaim (the "Counterclaims").[43] Tatra alleges: (i) breach of contract—failure to provide tax information; (ii) breach of contract—disclosing confidential information; (iii) breach of the duty of good faith and fair dealing; (iv) defamation; and (v) fraud and misrepresentation. SARN has moved to dismiss the Counterclaims.

SD3 and CSG have a related litigation pending before this Court.[44]

On April 18, 2018, SARN filed the Motion. On May 25, 2018, Tatra filed the Opposition. On June 11, 2018, SARN filed the Reply.

### III. PARTIES CONTENTIONS

A.    MOTION

SARN argues that the Court should dismiss all five of the Counterclaims. First, SARN contends that the breach of the contracts claims fail because: (1) the Agreement does not prohibit SARN from requesting payment before Tatra received payment from the Ministry; (2) the Agreement does not require SARN to produce proof of work; (3) the Complaint does not reference any confidential information in violation of the Agreement; and (4) the Counterclaim lacks specific damages.

Additionally, SARN claims that the Court should dismiss the breach of the duty of good faith and fair dealing claim and defamation claim because they concern two entities not party to

---

[42] Countercl. ¶ 44.
[43] The original Answer and Counterclaim was filed on January 16, 2018.
[44] *SARN SD3 LLC v. Czechoslavak Group a.s.*, C.A. No. N17C-12-185 EMD CCLD

6

this civil litigation—i.e., failure to join an indispensable party. SARN notes that Tatra did not join those entities to this civil action. Moreover, SARN contends that there are no facts to justify piercing the corporate veil. Finally, SARN argues the fraud claim fails because: (1) the conduct of this action is covered by the Agreement; (2) the parol evidence rule bars prior pre-contractual, oral representations; and (3) the fraud claim is not properly pleaded.

## B.     OPPOSITION

Tatra argues that SARN fails to apply the 12(b)(6) standard in the Motion. Tatra contends that the Counterclaims are well pleaded and state a claim upon which relief may be granted.

## IV. STANDARD OF REVIEW

## A.     CIVIL RULE 12(B)(6)

Upon a motion to dismiss under Civil Rule 12(b)(6), the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[45] However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[46]

---

[45] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[46] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

7

## V. DISCUSSION

**A.** **AT THIS STAGE IN THE PROCEEDINGS, TATRA HAS PROPERLY PLEAD CLAIMS FOR BREACH OF THE AGREEMENT**

Tatra argues that SARN breached the contract in that: (1) SARN failed to perform under the Agreement; (2) SARN tried to extort payments under the Agreement; (3) SARN breach Section 10 of the Agreement; and (4) SARN breached Section 8 of the Agreement. The Court will not dismiss the breach of contract claims. The Court more fully discussed the breach of contract disputes between SARN and Tatra in its decision on SARN's Motion for Judgment on the Pleadings.[47]

At this stage in the proceedings, the Court finds that Tatra has properly plead breach of contract claims. Accordingly, the Court will not dismiss Tatra's contact claims. However, the undisputed facts in this case seem to show: Tatra and SARN entering into the Agreement regarding that sale of Pandur vehicles; Tatra entering into an agreement with the Czech Ministry to sell 20 Pandur vehicles; Tatra receiving an initial payment for the Pandur vehicles from the Czech Ministry in June 2017; Tatra paying SARN $40,000 as partial payment in connection with the Agreement; and Tatra, through counsel, stating that "Tatra does not dispute its payment obligations" arising from the Agreement. These facts seem to indicate that Tatra and SARN entered into the Agreement, that Tatra admitted its liability to SARN and only later disclaimed the validity of the Agreement. Moreover, the Court has not been shown how the terms of the Agreement are ambiguous. Given this, the Court is convinced that focused discovery by the parties should quickly resolve any open issues on the breach of contract.

---

[47] *SARN Energy LLC v. Tatra Defence Vehicle a.s.*, C.A. No. N17C-06-355 EMD CCLD (Del. Super. Oct. 31, 2018).

8

**B.** **THE DEFAMATION AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING COUNT FAIL AS A MATTER OF LAW.**

To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege: (1) a specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages.[48]

Defamation consists of the "twin torts" of libel (written defamation) and slander (spoken defamation).[49] "Defamation is generally understood as 'a false publication calculated to bring one into disrepute.'"[50] To state a claim for defamation, a plaintiff must plead: (1) a defamatory communication; (2) publication; (3) reference to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.[51]

In the Motion, SARN does not appear to challenge any pleading deficiency with these two claims. Rather, SARN argues that: (1) Tatra does not have standing; (2) Tatra failed to include an indispensable party—CSG; and (3) SD3 is the appropriate defendant and Tatra cannot pierce the corporate veil.

### i. *Standing*

First, SARN argues that the defamation and fair dealing claims fail because Tatra lacks standing to bring the claims. Standing refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance.[52] A plaintiff must show that he or she sustained an injury-in-fact and that the interests it seeks to protect are truly protected.[53] An

---

[48] *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004906, at *3 (Del. Super. Aug. 17, 2015).
[49] *Read v. Carpenter,* 1995 WL 945544, at *2 (Del. Super. June 8, 1995).
[50] *Naples v. New Castle County*, 2015 WL 1478206, at *12 (Del. Super. Mar. 30, 2015), *aff'd,* 127 A.3d 399 (Del. 2015) (quoting *Read*, 1995 WL 945544, at *2).
[51] *See Read*, 1995 WL 945544, at *2.
[52] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).
[53] *Dover Historical Soc. v. City of Dover Plan. Commn.*, 838 A.2d 1103, 1100 (Del. 2003).

injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[54]

However, a party is liable for defaming a corporation when "the matter tends to prejudice [the corporation] in the conduct of its business or to deter others from dealing with it."[55] "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understand that it was intended to refer."[56] Further, "[i]t is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended."[57] Although a corporation is not generally defamed by defamatory statements of its officers, agents, or stockholders, a corporation may be harmed in that situation if the statements "also reflect discredit upon the method by which the corporation conducts its business."[58]

It is somewhat unclear whether a subsidiary may sue for defamation when a defamatory statement targets a parent company and does not mention the subsidiary. Tatra relies upon *Perlman v. Vox Media, Inc.* for the proposition that a subsidiary may sue when defamation against a parent company harms the subsidiary.[59] In *Perlman*, Mr. Perlman was CEO of Artemis and Rearden.[60] Rearden created a subsidiary, OnLive.[61] Vox published several allegedly

---

[54] *Kostyshyn v. Commissioners of Town of Bellefonte*, 2006 WL 3501874, at *2 (Del. Super. Nov. 30, 2006).
[55] Restatement (Second) of Torts § 561.
[56] Restatement (Second) of Torts § 564.
[57] Restatement (Second) of Torts § 564 cmt. b.
[58] Restatement (Second) of Torts § 561 cmt. b.
[59] 2015 WL 5724838, at *1 (Del. Ch. Sept. 30, 2015).
[60] *Id.*
[61] *Id.*

defamatory news stories about Mr. Perlman and OnLive.[62] Artemis sought damages for defamation.[63]

The Court found that "it is at least reasonably conceivable that Plaintiffs will be able to prove that the typical reader of the 2014 Article will associate Artemis with Perlman and Rearden and will understand that they should not invest with Artemis because of Perlman's history at OnLive . . . ."[64] The Court found that the 2014 later article that referenced Artemis and related back to the other articles defaming Mr. Perlman.[65]

Unlike *Perlman*, there is no direct connection between Tatra and CSG in the alleged defamatory statements. The letters specifically referenced CSG and another company. There is no mention of Tatra in the letters. Moreover, the letters are on SD3 letterhead. Without more, Tatra's claims appear to be claims between CSG and SD3 and not Tatra and SARN

### ii. Indispensable Party

SARN argues that CSG is an indispensable party to the defamation claim because the letters talked about CSG and not Tatra. The Court makes a two-part inquiry to determine if a cause of action should be dismissed for failure to join a necessary and indispensable party under Superior Court Rule of Civil Procedure 19 ("Rule 19").[66] First, the Court determines whether the party is necessary.[67] If joiner is not possible, the Court must determine whether the party is indispensable. To determine if a non-party is indispensable, the Court considers:

> First, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the

---

[62] *Id.*
[63] *Id.*
[64] *Id.* at *16.
[65] *Id.*
[66] *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993).
[67] *See* Del. Super. Ct. Civ. R. 19(a).

person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.[68]

SARN argues that CSG is necessary to the defamation and fair dealing claims since the claims rely upon CSG's activities. Further, SARN argues that CSG is necessary because CSG would have been the party harmed in this case. SARN relies upon *Graham v. State Farm Mut. Ins. Co.* [69] In *Graham*, the Court found a third-party necessary because the court's decision would be based upon the third-party's conduct.[70]

Tatra appears to have the better argument as to indispensable party. Judgment can be rendered without CSG. The defamation claim relies upon the statements made about CSG; however, any damages in this claim will only relate to Tatra. Therefore, CSG will still have its own cause of action and there is no indication that there will be duplicative damages because there are separate harms to CSG and Tatra. SARN can still seek discovery from CSG relating to the defamation and fair dealing claims.

SARN is correct that this Court likely lacks jurisdiction over CSG in this case.[71] CSG is a foreign corporation. It does not appear that Delaware has jurisdiction over CSG under the long-arm-statute. As noted earlier, CSG is involved in litigation with SD3 in this Court; however, that is a separate actions and jurisdiction in that case does not necessarily mean the Court would have jurisdiction over CSG here. Without more, the Court finds that jurisdiction over CSG would likely violate due process.

---

[68] Del. Super. Ct. Civ. R. 19(b).
[69] 2006 WL 1600949, at *1 (Del. Super. June 12, 2006).
[70] *Id.*
[71] To determine whether Delaware has jurisdiction over a party requires a two-step analysis. First, the Court determines if there is a statutory basis under the long-arm statute. Next, the Court determines if subjecting the party to jurisdiction would violate Due Process. *See Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *6 (Del. Ch. July 14, 2008).

### iii.    *Piercing the Corporate Veil*

The deciding issue here is alter-ego liability.  SARN argues that Tatra's defamation and bad faith claims are against the wrong party.  SD3 sent the letters, not SARN.[72]  Therefore, SARN is not responsible for SD3's actions.  Tatra argues that SARN may be responsible under an alter-ego theory.  Tatra conflates SARN and SD3 by alleging that these two entities are alter egos.[73]

Alter-ego liability is analogous to veil piercing.  Therefore, it "requires that the corporate structure cause fraud or similar injustice.[74]  The injustice must be more than a breach of contract.  Generally, this requires the plaintiff to show that the defendant is "involved in an elaborate shell game or [is] otherwise abusing the corporate form to effect a fraud."[75]  "Mere dominion and control of the parent over the subsidiary will not support alter ego liability."[76]  Rather, "[t]he degree of control required is exclusive domination and contract . . . to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own."[77]

Tatra alleges that SARN and SD3 share a business address, phone number, key principals, and conduct the same type of business.  This does not seem to be enough to successfully prosecute an alter ego claim.  Under Civil Rule 12(b) standards, however, the Court could logically infer from the pleading that there is an alter-ego issue and allow discovery to confirm or disprove the matter.  More importantly, this is the wrong court for such a claim.  If

---

[72] Tatra attempts to work around this fact by contending that Mr. Borneman does not affirmatively state that he is only writing the letters on behalf of SD3 and not SARN.  *See, e.g.,* Countercl. ¶ 43.  This is an illogical burden shift.  Moreover, the Court is not aware of any legal principle or requirement that Mr. Borneman has to provide he is only writing on behalf of SD3 and not any of SD3's affiliates or subsidiaries in letters sent by SD3.

[73] Tatra does allege that SARN and SD3 colluded, but Tatra does not assert a civil conspiracy claim.

[74] *Outokumpu Engr. Enterprises, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. 1996).

[75] *Id. at* 729; *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989) ("The law requires that fraud or injustice be found in the defendants' use of the corporate form.").

[76] *Outokumpu*, 685 A.2d at 729 (citing *Mobil Oil Corp.,* 718 F. Supp. at 266.

[77] *Outokumpu*, 685 A.2d at 729 n. 2 (quoting *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 1992 WL 127567 (Del. Ch. May 28, 1992)) (internal quotations omitted).

13

there is a potential that SARN could be liable for SD3's conduct under an alter-ego theory, then

Tatra must pursue the claim in the Chancery Court.[78]

As plead, the Court finds that the Counterclaims for defamation and fair dealing claims

must be dismissed.[79] Tatra seeks relief against the wrong party, SARN and not SD3, and the

Court cannot allow an alter-ego theory to proceed here. The Court will dismiss these claims.

The Court will stay dismissal for 20 days to allow Tetra can seek additional relief as is available

under Delaware law—*e.g.*, transfer of these counterclaims to the Chancery Court.

## C. THE FRAUDULENT INDUCEMENT CLAIM IS DUPLICATIVE OF THE BREACH OF CONTRACT CLAIMS AND IS DISMISSED.

To plead a claim of fraud, plaintiff must show:

(1) a false representation, usually one of fact . . .; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to

---

[78] *See, e.g., Chaplake Holdings, Ltd. V. Chrysler Corp.*, 1995 WL 653510, at *4 (Del. Super. Aug. 11, 1995)(Superior Court lacks jurisdiction to apply an alter-ego theory); *see also Park Oil, Inc. v. Getty Refining and Marketing Co.*, 407 A.2d 533, 535 (Del. 1979).

[79] Tatra could have, but did not seek to have the Court designated to preside in Chancery over the Counterclaims. *See Yu v. GSM Nation, LLC*, 2017 WL 2889515 (Del. Ch. July 7, 2017) (alter ego or veil piercing theory is an equitable claim). Since this is an equitable claim, the parties would need to either file this particular claim in the Court of Chancery or seek to have this judicial officer designated as a Vice Chancellor.

Section thirteen of Article IV of the Delaware Constitution provides in pertinent part:

The Chief Justice of the Supreme Court . . . shall be administrative head of all the courts in the State, and shall have general administrative and supervisory powers over all the courts. Such powers shall include but shall not be limited to the following:

. . .

(2) Upon written request made by the Chancellor . . . to designate one or more of the State Judges (including the Justices of the Supreme Court) to sit in the Court of Chancery . . . and to hear and decide such causes in such Court and for such period of time as shall be designated. It shall be the duty of the State Judge so designated to serve according to such designation as a Judge of the Court designated.

In order for a Superior Court Judge to be designated as a Vice Chancellor, the Chancellor must request such assignment from the Supreme Court. The practice that has evolved is that the party seeking designation must provide a written request, usually in the form of a letter, to the Chancellor requesting such designation and explaining why designation is appropriate. If the Chancellor decides that designation is appropriate, the Chancellor will provide a written request for designation to the Chief Justice for a final determination. *See The Dow Chemical Co. v. Organik Kimya Hldgs.*, C.A. N15C-06-252 EMD (Del. Super. Dec. 10, 2015).

14

the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[80]

In Delaware, there are three types of fraud: "(1) false statements represented as truth; (2) active concealment of facts which prevents the other party from discovering them; and (3) silence in the face of a duty to speak."[81]

SARN argues that Tatra's fraudulent inducement claim should be dismissed because: (1) the fraud claim is duplicative of the contract claim; (2) parol evidence precludes Tatra from introducing pre-contractual oral representations that are inconsistent with the Agreement; and (3) Tatra failed to plead fraud with particularity.

### i. Parol Evidence

When a written contract is intended to be the final expression of the parties' agreement, the parol evidence rule prohibits the introduction of prior or contemporaneous oral understandings.[82]

> The parol evidence rule is a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing. Where a written agreement is meant to be final and complete, it is a totally integrated contract. If a written agreement is final and incomplete, it is a partially integrated contract.... The parol evidence rule prevents the consideration of oral evidence that would *contradict* either total or partial [sic] integrated agreements.[83]

Therefore, the Court must determine "whether the parties' written contract was intended to be the final expression of their agreement, and second whether the alleged oral representations would contradict with the written terms of the agreement."[84] The Court should consider several

---

[80] *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992)).

[81] *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1137 (D. Del. 1996).

[82] *Taylor v. Jones*, 2002 WL 31926612 (Del. Ch. Dec. 17, 2002).

[83] *Carrow v. Arnold*, 2006 WL 3289582, at *4 (Del. Ch. Oct. 31, 2006), *aff'd,* 933 A.2d 1249 (Del. 2007) (citing *Taylor v. Jones*, 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002)).

[84] *Carrow v. Arnold,* 2006 WL 3289582, at *4 (Del. Ch. Oct. 31, 2006).

factors to determine whether the contract was intended as a final expression. Those factors include:

> the intent of the parties, where such intent is discernible; the language of the contract itself and whether it contains an integration clause; whether the instrument was carefully and formally drafted; the amount of time the parties had to consider the terms of the contract; whether the parties bargained over specific terms; and whether the contract addresses questions that naturally arise out of the subject matter.[85]

The absence of an integration clause "does not necessarily mean that the parties did not intend the contract to be the final and complete expression of their agreement."[86] Rather, the Court should consider the factors listed above.

As plead, the Agreement could be a partially integrated contract. The Agreement is three pages. Although a short contract may be fully integrated without an integration clause, the description of SARN's duties under the Agreement are "[SARN] will exert best efforts to advise [Tatra] on geopolitical policy matters in the sale of Pandur vehicles to the Slovak Republic and Czech Republic."[87] The parties did not heavily negotiate this contract. Further, it does not appear that the parties carefully drafted the section discussing SARN's duties under the Agreement.

However, even if the Agreement was fully integrated, the parol evidence would likely still be admissible. Parol evidence is permitted in the face of a fully integrated contract to clarify ambiguous contract language or when the contract is a product of fraud or misrepresentation.[88] Parol evidence relating to "using best efforts" may be available to further the breach of contract

---

[85] *Carrow,* 2006 WL 3289582, at *4 (citing *Taylor v. Jones*, 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002)).
[86] *Id.*
[87] Agreement § 2.
[88] *Id.*

claim. Additionally, it is possible that Tatra can rely on the prior statement to further a fraud claim.

Generally, prior oral promises will not suffice to invoke the fraud exception.[89] These types of promises typically deal with future actions. However, misrepresentations about present facts may end in a different result.[90] In *Anglin v. Bergold*, sellers presented maintenance logs for an aircraft that misrepresented the maintenance performed on the aircraft. The Court allowed the evidence of the fraud under the exception to the parol evidence rule because the misrepresentations were in fact. Rather than some future promise. The same holds true in this case. SARN's alleged misrepresentations were in fact. Tatra alleges that SARN used a false address and lied about having connections within the United States, Czech Republic and Slovak Republic governments. If SARN's arguments were solely based on parol evidence or whether the fraudulent inducement claim was plead with enough particularity, the Court might let Tatra proceed. The problem here relates to "bootstrapping" contract claims into a fraud claim.

### ii. *Bootstrapping*

"A fraud claim can be based on representations found in a contract, however, 'where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort.'"[91] A plaintiff "cannot bootstrap" a claim for a breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations" or "simply by adding the term fraudulently induced to a complaint."[92] Essentially, a fraud claim alleged

---

[89] *Id* at *9.

[90] *See Anglin v. Bergold*,

[91] *ITW Glob. Investments Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. June 24, 2015) (citing *Ameristar Casinos, Inc. v. Resorts Int'l Hldg., LLC*, 2010 WL 1875631, at *11 (Del. Ch. June 24, 2010)).

[92] *Furnari,* 2014 WL 1678419, at *8 (quoting *Narrowstep Inc. v. Onstream Media Corp.,* 2010 WL 5422405, at *15 (Del. Ch. 2010)).

contemporaneously with a breach of contract claim may survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[93] Allegations that are focused on inducement to contract are 'separate and distinct' conduct."[94]

Tatra's claim appears to allege that SARN did not have and therefore did not use any connections with the United States, Czech Republic, or Slovak Republic governments. Further, Tatra argues that SARN did not perform any benefit to Tatra under the Agreement. These are allegations that SARN purportedly knew it could not fulfill or perform promises of future action—classic bootstrapping. If SARN could not perform its obligations due to lack of connections or did not otherwise meet its performance obligations under the Agreement, Tatra has breach of contract and not fraudulent inducement claims. Because the Court finds that Tatra's fraudulent inducement claim rehashes the same arguments as the breach of contract claim, the Court will dismiss the fraudulent inducement claim.

## VI. CONCLUSION

For the reasons set forth above, the Court **GRANTS in part and DENIES in part** the Motion. The Court will allow the breach of contract claims to proceed, but dismisses Tatra's defamation, good faith and fair dealing, and fraudulent inducement claims.

/s/ Eric M. Davis
Eric M. Davis, Judge

cc:     File&ServeXpress

---

[93] *Furnari,* 2014 WL 1678419, at *8.
[94] *ITW Glob.,* 2015 WL 3970908, at *6 (quoting *Osram Sylvania Inc. v. Townsend Ventures, LLC,* 2013 WL 6199554, at *16–17 (Del. Ch.2013)); *see also Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *6 (Del. Super. July 2, 2015) (citing *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16-17 (Del. Ch. Nov. 19, 2013)).